Moving on this morning, our next case for argument is United States v. Taylor and Thomas. Welcome back. Thank you, your honor. I'll be back in two weeks again if you want to see me then. May it please the court, counsel. Good morning, your honors. My name is Joanna Christensen and I represent the appellant, Styles Taylor, in this case. My co-counsel will be speaking on Mr. Thomas' behalf. A sentence to die in prison for a crime committed at the age of 19 by an intellectually low-functioning juvenile child is substantially unreasonable in this case. I recognize this is a within-guideline sentence. It does not comport with the balancing of the 3553A factors and is longer than necessary to meet those factors. Mr. Taylor is not a lost cause. He suffered horribly at the hands of his family and at the hands of society. Of course, the first factor listed is the circumstances and nature of the offense. This offense is horrible and serious and caused irreparable damage to a family that had already been affected by murder, but that's not the only factor in this case. We have to consider the history and characteristics of Mr. Taylor himself. It's not hard to think of worse crimes that have been committed, but it is hard to think of worse backgrounds of a defendant. He was unwanted, tried to be aborted, three months premature, drug-addicted, abandoned, beaten, fed beer and marijuana, used as a pawn for criminal behavior at four. That's just the beginning. And I will submit to this court that the end when Mr. Taylor went to prison for this case is the logical conclusion for that beginning. Is there any evidence submitted at sentencing as to your client? I know there was as to Mr. Thomas and all that he had accomplished while he was incarcerated originally until the resentencing. Was there any evidence on what Mr. Taylor had accomplished in prison during that period of time? Yes, there was. The defense counsel's sentencing memorandum at sentencing listed the hundreds of classes he had taken. He graduated from the SMU program within the Bureau of Prisons, which takes offenders like Mr. Taylor, who really don't have a basis in functioning in the real world, and builds up those skills. And he's passed that successfully. So he has made great strides while in prison, suggesting that had he been given this kind of structure as a younger child, or even for longer when he was an adolescent because he was at the Colorado Boys Ranch for a significant amount of time, this may not have happened. He takes responsibility for this offense, but that's got to be balanced from where he came from. Most notably, in the time that he spent in prison in this case, his IQ tested 20 points by his resentencing in 2016 than it had at the time of the offense, or shortly after the offense. The judge also noted at sentencing during this period of incarceration that Mr. Taylor had more than 40 prison sanctions, and the way that, you know, our standard here is abuse of discretion. How do you get around that factor that the judge found countered some of these other good points? I think that is a significant factor, and of course the judge considered it. I don't think that we can expect anyone with Mr. Taylor's background to go even into a prison situation and behave perfectly from day one. But 40 sanctions? I'm not sure I've seen a case with more sanctions in prison than that. I think that's significant. I think it does attest to the nature of his cognitive disabilities and his inability to be a functioning member of almost any society. We also have to keep in mind that at the level he was incarcerated at USP, because he's serving life in prison, so he's going to be incarcerated at USP, that those sanctions are probably more readily imposed, and probably to maintain structure at the prison are probably sanctioned more often than perhaps at a camp. And the nature of the people he's in prison with also will have an effect on how his behavior is, of course. He's shown to be someone who is more of a follower than a leader, and I think he's aged out of that or starting to age out of that in prison, and we're certainly not asking for immediate release. We weren't asking for probation. The Sentence Defense Council has repeatedly asked for his 30 years, and he's already served, I believe, 17 of those years. The crime happened a little bit more than 18 years ago. And he's a work in progress, and we acknowledge that prison can both help him rehabilitate, and if he's allowed to have a light at the end of that tunnel rather than death in prison, that's a significant factor in his rehabilitation. I will also discuss his age, the need to reflect the seriousness and provide just punishment. Again, 30 years is going to provide the punishment that life would also provide. The difference with life is that this is really death in prison. My clients often refer to a life sentence as toe-tagged life, because you're not leaving the prison without a toe-tag on. That is the worst punishment that we can give as a society. He did escape the death penalty, and much has been made of that, but in reality, he will die at the hands of the federal government, whether it's through the death penalty or the fact that he will die in prison. That's a substantially unreasonable sentence. Unless the court has further questions, I'll reserve my time for rebuttal. Thank you. Thank you. Ms. Benjamin. May it please the court, my name is Allison Benjamin, and I am the attorney for defendant appellant Keon Thomas. Our issue is essentially the same, whether his life sentence was substantively unreasonable in light of the 3553A factors and his personal history and characteristics. I don't belabor the nature of the offense, I think it's clear it was a horrific offense. In looking towards Mr. Freud, the victim of the offense, you couldn't paint a picture of a more honorable person, and that's clear. But that is not the only thing for the court to consider in this case. It's only one factor. The other important factor, especially when it comes to my client, Mr. Thomas, is that 18 years ago when this offense was committed, he was a complete product of a roundly dysfunctional family with parents incapable of providing the basic life necessities, let alone any sort of foundation for a productive life. He was maltreated from birth, and he grew up believing that chaos, instability, violence, using and selling drugs were all normal activities because that's all he ever knew. He's a different person today, but back then, more recent to the crime, he was born to a mentally unstable mother who herself started drinking at age seven and who never stopped drinking even while she was pregnant with him. His mother was high one way or another, whether through alcohol, marijuana, cocaine, or crack for his entire life outside of prison. She had no job skills, so in turn what she did was she moved the family in with any man who would take them in. It didn't matter how drunk they were, how drugged they were, how violent they were, or how corrosive that environment was. She moved her kids with her into that household. His own father was a heroin addict who was known to beat women, and although Mr. Thomas didn't have much contact with him, he did spend two summers when he was around ages 11 and 12 with his father, and what occurred during those two visits speaks volumes. The first summer, his father was drugged the whole summer. The second summer, not only was his father drugged, but our client saw his father commit acts of violence against women, namely he watches his father hid behind a door waiting for his father's girlfriend to come into the room, and then he pounced on her and assaulted her in front of Mr. Thomas. It was about a week after, maybe two weeks after Mr. Thomas returned back to Indiana from that visit that his father died, stabbed at the hands of a girlfriend. Now it's important to look at Mr. Thomas' formative years, ages 6 to 13, because that was when he was in the most violent household ever. His mother lived with a man 40 years his senior who drank and used drugs, beat his mother in front of him with a hammer, with a telephone, and we're not talking today's telephones, we're talking about the big heavy ones that we had back in the 90s, chased her around the house with a hatchet, chased her around the house with a pistol all in front of him and in front of his younger sister, Kamika, who was five years younger than him, and in turn he was beat by his mother. He was beat with extension cords and belts. He was beat with brooms and pool cubes. He was punched with her fists, and he was kicked with her feet. Moving from that house from age 13 on for the rest of his adolescence, the family lived with a man who grew marijuana and sold it out of the house. It was only worse. There were house parties where marijuana and alcohol were consumed regularly, and it was my client and his younger sister's job to clean up the marijuana reefers the next day after the party. At age 13, he had no supervision whatsoever, and he was allowed to run the streets all night long with whoever he chose. So looking at that, it's unsurprising, and looking at the chaos that he lived in with a substance abusing mother, a violent home, and a chaotic home environment, that at age eight, he was aware of his mother's drinking, and he was able to verbalize it to others that his mother drank all day, every day. At age nine, he began drinking alcohol and smoking marijuana. At age 13, he was selling marijuana, and at age 15, he was smoking marijuana daily, and he could drink three to four pints of gin on his own. He graduated from that household straight to prison at age 19. And if you were to look and make a book about his life, starting with the very first page, when you read about his mother's own background and how she was raised, and continuing on page by page, every page you turn, you get an increasingly sinking feeling that nothing good is going to result from this, that the ending is going to be very bad, no matter what. You may not know it, but it will be bad, and quite frankly, it was. It was bad not only at age 19, when he committed his first felony offense, and the sentence was 10 years in prison at age 19 for somebody who was a complete product of their environment, who knew nothing else in their life. He came out of prison, was out for a few months, and then he and Mr. Taylor, who himself, had a substantially horrible background, the two of them got together and committed this offense. And the end result of that book was a sentence of life imprisonment. The murder of a very honorable man, and a sentence of life imprisonment. Thank you. Thank you. Mr. Haller. Good morning, Your Honors. May it please the Court. The life sentences of murder are reasonable for both of the defendants. This Court has never found a within guideline sentence to be substantively reasonable, and this is not the case to break new ground. The Court will affirm the sentence as long as it falls within the bounds of reason the discretion is broad. All of these arguments were made to the District Court. They've been made actually three times to District Court judges. They've been rejected every time, and there's no basis for this Court to overrule that position. You've been doing this a long time. What sort of considerations might come into play in a valid substantive unreasonableness argument? Can you conceive of something that might be sort of within the 40-yard lines? For this Court, to consider a sentence substantively unreasonable, I mean, I guess over the years there's been, not in this Court, but there have been occasional sentences, probably something where the guideline itself just seems to be totally off kilter, but the Sentencing Commission hasn't come to appreciate that yet, I guess. I mean, I don't know. Something structural with respect to the nature of the crime and the guideline sentence, rather than something specific to the defendant? Well, I mean, I suppose there could be particular cases where there's something so factually specific and apparent about a specific case. I mean, if this were a, maybe in the olden days before the drug guidelines had changed a crack case, and you had the defendants with these kinds of backgrounds, but the quantity had driven up through the roof, I mean, you know, I don't know. I'm in the position of the United States, I'm not really in a position to be trying to come up with good examples, but I mean, there could be situations where a sentence was totally unreasonable. Probably they would be more structurally based on the guidelines, though, than on a specific factor, because those kinds of things can be weighed differently by different people. Some people, some district court judges might think that this warranted a non-life sentence. I tend to think most district court judges would agree that a life sentence was warranted, but ultimately it is up to the judge who was there, who sat through the two and a half week trial in this case, who saw the evidence, who saw the impact on the victims, who saw the defendants in court on a daily basis, and who's reviewed this record thoroughly and seen in greater detail than this court needs to review exactly what those disciplinary sanctions were, exactly what the testimony was or what the evidence was that was presented from all of these relatives, and to weigh those factors. There's no doubt that Mr. Thomas and Mr. Taylor both had terrible upbringings, but this court has said before, in Long and Perez-Leon, a district court is entitled to reject that if circumstances don't justify a below-range sentence. They certainly don't do that here. Well, the reality is it kind of cuts both ways, because it is predictive of further violence, or something short of that, further criminality of serious types. A lot of this cuts both ways, and the report, the fairly recent report, that Mr. Taylor in particular cannot function outside of a highly structured, nurturing environment, one can read a lot of things between the lines of that. In certain prisons, he's committed a host of violations. When he gets in certain highly structured environments, he's better off. When he was taken back for resentencing to the MCC, he committed a raft of new violations. I don't know that any district court judge would be comfortable releasing him into society now, or making any kind of prediction that at any point in the future, he is somebody who's going to be released. That's sad. That's an extremely sad commentary, but the ultimate reality, Your Honors, is there's only one person who was toe-tagged in this case, and that's Frank Freund. This was a murder case, and the guidelines, rightly in our view, and I believe rightly in the district court's view, recommend a life sentence for murder. That was the appropriate sentence in this case. We're going to have to see the judgment paper. Thank you. Ms. Christensen. This court has never found a within-guideline sentence substantively unreasonable, and I believe there is a case. There has to be, or the standard would not exist. If we cannot make the argument that a guideline sentence is substantively unreasonable, then the presumption is not rebuttable, and the Supreme Court has got to change their law in Booker. It's a rebuttable presumption, and in this case, we believe we can rebut that presumption. It is up to the district court judge, and district court judges get to see these people, both the victims' families, the autopsy picture, and the defendants, but this judge was faced with two prior impositions of life sentences, and it's hard to make a decision when you've seen all of that and to vary from that, and I believe that the judge was stuck with the life sentence in this case and perhaps predisposed not to consider anything but the violence of the offense, and that in there is where the error lies. Defendants age out of criminality, so yes, their backgrounds point to further criminal behavior. We have to remember how long this case has been pending on a direct appeal, which is age out. The question is, does he age out in prison, or does he age out with the possibility of a term of years? I see that my time is up. Mr. Taylor does have a difficult time functioning outside of a structured environment, but that is because of the environment in which he raised. Society missed him, and he fell through the cracks by the age of four. One could argue much younger than that, and if we can't fix that and he has to be in prison for the rest of their life, then he's not the only one that we have failed. So I ask the court to reverse and demand his sentence. Thank you. Thank you. Ms. Benjamin? I share Attorney Christensen's concerns about the fact that there have been three life sentences imposed in this matter, but I would point out that back in April of 2005, when the life sentences were imposed for Mr. Taylor and Mr. Thomas, they had a joint sentencing hearing, and the only item discussed at the sentencing hearing were the sentencing guidelines. There was no mitigation presented at that sentencing hearing. So for me, the concern is that, yes, they've been stuck with this sentence now two more times, because it is difficult to look a victim family in the face and say, forget what that other judge did, I'm going to do something different. When I talk, when I look to my client now, just in closing, I would say, he's not the same person that we met even three years ago, four years ago, when the second sentencing occurred. We don't dispute that when he was first convicted and sentenced in 2005, he was angry. He was in denial, and he did not accept responsibility at all. But over the course of years, there has been an opening in him that we didn't know would even happen. And I think it's evident by his allocution at the sentencing hearing, where to paraphrase, he says, you know, it's crazy, I'm sitting in here for a life sentence, but actually, I'm thankful because I was here long enough, whether I ever get out again, to see and know that what I did was wrong. He has accomplished significant strides while incarcerated, the classes mentioned, participating in the financial responsibility program, always working. He's shown that he's not the same person at almost 44 that he was at 25. Thank you. Thank you. Our thanks to all counsel, the case is taken under advisement.